**ANDERSEN et al. v. WILHELMSEN et al.**

**No. 507.**

District Court, D. Massachusetts.

March 10, 1941.

Fitz-Henry Smith, Jr., and Charles H. Loring, both of Boston, Mass., for plaintiff.

Arthur J. Santry, Frederick Fish, and Putnam, Bell, Dutch & Santry, all of Boston, Mass., and Bingham, Englar, Jones & Houston, of New York City, for defendant Atlantic & Gulf Stevedores, Inc.

Richard W. Hall, of Boston, Mass., for defendants Mystic Terminal Co. and Boston & M. R. R.

Thomas H. Walsh, of Boston, Mass., for defendant Wilh. Wilhelmsen.

FORD, District Judge.

This is a jury-waived action at law in which the plaintiffs are co-partners and citizens of New York State and the two remaining defendants—the others having

516

been dropped—The Mystic Terminal Company (hereinafter called Terminal) and Boston and Maine Railroad (hereinafter called Railroad) are Massachusetts corporations doing business in Boston.

Damages are sought for the alleged negligence of the corporate defendants in handling and caring for a shipment of bales of wood pulp belonging to the plaintiffs shipped from Greaker, Norway, to Boston, Massachusetts, aboard the vessel "Tigre".

### Findings of Fact.

The plaintiffs were the owners and consignees of 2,250 bales of dry, bleached, sulphite wood pulp shipped from Greaker, Norway, on or about December 27, 1937, on the motor vessel "Tigre", owned and operated by one Wilhelmsen, a dropped defendant.

The vessel arrived at the port of Boston, January 13, 1938, and docked at one of the piers (Pier 43) of Terminal. The shipment was discharged from the vessel January 13, and 14 by a dropped defendant, Atlantic & Gulf Stevedores, Inc. (hereinafter called Stevedores), employed by the owner of the vessel, and delivered into the custody of Terminal on Pier 43. A few days after the shipment was placed upon Pier 43, 1,950 of the bales were loaded onto cars of the Railroad and sent to a storage warehouse of Terminal at Billerica, Massachusetts.

The bales were taken out of the ship by means of the ship's tackle with hooks attached, and after being landed on the dock of Terminal, were placed in piles by Stevedores under the direction of a clerk of Peabody and Lane, Inc., steamship agents. Hand trucks were used by Stevedores in placing the bales and cotton hooks were employed in tipping the bales on the trucks. In accordance with a well-established custom, it was the duty of the steamship agent's clerk to place damaged bales in a shipment to one side. The shipping clerk testified he found none of them damaged and no such disposition was required in this case.

Each bale was 34 inches long, 26 inches wide, and 20 inches high, weighed about 375 pounds and contained about 450 individual sheets of wood pulp. Each bale had two protective wrappers, one of wood pulp similar to the material in the sheets, an inner wrapper, and an outer wrapper of heavy brown paper. Wires lengthwise and crosswise were fastened around the outside of the bales, tightly compressing them.

After the bales were consigned to their proper place on the pier by the clerk of Peabody and Lane, Inc., Terminal delivered to the former a receipt containing the following terms: "January 14, 1938 * * * Received in good order and condition from on board the S. S. Tigre * * * the following Merchandise for account Stone & Downer Co. * * * Total 2250 Packages Merchandise".

On January 15, 1938, Terminal, through its superintendent, notified the plaintiffs by letter at their New York office that, "We have on hand ex this vessel [Tigre] the following pulp for your clients in good condition, except as noted: No. of Bales 2250". No exceptions as to condition appeared on this notice.

A warehouse receipt dated February 7, 1938, also was sent to the plaintiffs by Terminal certifying that the latter "has received in Storage at * * * Billerica Shop, North Billerica, Mass., * * * in apparent good order * * * the following described property * * * 2250 bales Woodpulp".

There was no dispute that storage charges were paid by the plaintiffs.

It is perfectly evident from the contents of these documents referred to above, and the fact that the steamship agent's clerk found none of the bales in damaged condition when they were first unloaded from the vessel and checked, that the 2,250 bales were delivered into the custody of Terminal in good condition and not damaged in any such manner that damage could be caused to the sheets of wood pulp inside the wrappers by infiltration of dirt or other extraneous matter.

The white wood pulp contained in the bales here in question was of a very high grade and was used in making high-grade bonds and ledgers. The evidence showed that dirt or other extraneous matter in pulp of this type would make the pulp unfit for use in high-grade bond and similar No. 1 paper sheets. Under these circumstances it could only be employed for inferior sheets, such as are used for mimeographing and the like.

The first inspection of the bales after they were lodged in the custody of Terminal took place January 26, 1938. At that time 300 bales were still on Pier 43 of Terminal, 1,950 bales having been sent

about a week before to the warehouse in Billerica. This inspection was made by a paper and pulp expert employed by the American Writing Paper Corporation, of Holyoke, Massachusetts, prospective purchaser of the wood pulp, and was made for the purpose of determining whether or not the pulp was fit for use in making high-grade or No. 1 papers. This expert's evidence showed at that time the wrappers about the bales were torn and smeared with a brown, gummy or syrupy material, and the presence of dirt all around the sides of the bales. The wires were off, or partly off, many of the bales. In some cases both wrappers were partly off and the wood pulp was exposed. The syrupy substance present on the floor of the pier adjacent to the bales had gotten on the edges and bottom of the wrappers. Some of the bales were exposed and black dust or dirt had sifted inside onto the edges of the sheets of pulp. There were also cuts in the wrappers three or four inches wide, extending into the bales and exposing the pulp. At least 50 per cent of the bales were affected in this manner. Further inspections were made by this expert of the 1,950 bales at Billerica and they were found to be in substantially the same condition. The whole shipment was rejected by this expert as unfit for high-grade paper.

An expert cargo surveyor with long experience in wood pulp inspection also testified as to the condition of the 300 bales on the pier and the 1,950 bales at Billerica. He found them in substantially the same condition as the expert for the American Writing Paper Corporation. He made his first inspection on February 1st. He stated, and I find it to be a fact, that there had accumulated on many of the wood pulp sheets in the 300 bales on the pier extraneous matter which he called "dock dust" and also that there was a "blackish syrupy substance on the edges of the sheets of pulp in the bale". There were cuts penetrating the bales to the pulp sheets. The 1,950 bales of pulp sheets were in the same condition as those on the pier with the exception that no syrupy substance was present. This witness stated, and I find it to be a fact, that practically the entire shipment was affected by the presence of extraneous matter on the edges of the pulp sheets and that it was through the vents in the wrappers that this foreign matter sifted. Other evidence introduced by the plaintiffs confirmed the existence of these conditions of the shipment both on the wharf and at the storage warehouse at Billerica.

The plaintiffs introduced evidence to show that what is known as a "chisel truck" was used by Terminal in moving heavy bales about its pier and it was admitted by the defendants that this type of truck was used by Terminal in loading the 1,950 bales from the pier onto the cars of the Railroad and by the Railroad from the cars into the warehouse at Billerica. There was no direct evidence they were used before the shipment to Billerica. This type of truck was 27 to 28 inches wide, motor driven, and had three prongs extending out in front of a stanchion attached to the forward part of the small truck. The prongs were close to the floor and for purposes of moving the bales were shoved up under the bales, the stanchion tipped back mechanically by the operator and the bales carried off. Usually a man stood by the bale and lifted it with a crowbar in order to allow the prongs to pass easily underneath the bale. The evidence showed that if the prongs caught the bales they would penetrate the outside coverings. There was no direct evidence that any damage had been caused by these "chisel trucks", although the evidence showed that the bales had been moved from the original area to which they had been consigned to various locations after they came into the possession of Terminal and between January 15 and January 26.

## Conclusions.

We can start with the assertion that the damage to the bales that was caused by the syrupy substance was due to the presence of this material on the floor of the pier. It is reasonable to conclude that this substance was present because of the Terminal's lack of care in making the floor of the pier a reasonably safe place to put bales of wood pulp, especially if there were any tears or vents in the wrappings of the bales that would allow the substance to reach the pulp itself and damage it as I have found it did in this case. This syrupy substance would have done no damage to the bales except for the torn wrappers exposing the pulp; nor would there have been any dirt or dust in the pulp if there were no vents in the wrappers through which the dirt could sift, and we come to the question, who caused the tears and vents?

▌ Terminal, being a bailee for hire, was required to exercise ordinary care for the protection and safety of the goods entrusted to its custody and this obligation was co-extensive with its actual possession of the goods. Sessions et al. v. Western Railroad Corp., 82 Mass. 132, 134, 16 Gray 132, 134. In determining the quality of the care to be exercised by a bailee for hire, all the circumstances must be taken into account. Elements to be considered are the nature of the shipment and its value. Here, we have bales of pulp, easily damaged by dirt or other extraneous matter if the wrappers are torn or penetrated. Terminal should have taken into consideration this fact and used reasonable care to guard against any such occurrence. Morse v. Homer's, Inc., 295 Mass. 606, 609, 4 N.E.2d 625.

▌ The bales were in good condition on January 15 when Terminal received them on Pier 43. Terminal said so. Its attempt, by parol evidence, to contradict the terms of the receipt and notice was unavailing. Again, if there were any vents in the bales which exposed the pulp when they were being unloaded from the vessel they would have been set aside for repairs by the shipping clerk. None was. And, it is reasonable to suppose Terminal would have made some notation of holes or vents on the various documents given by it to the plaintiffs and the shipping agents if any were present when Terminal received the merchandise. In view of Terminal's admissions in the documents, the latter cannot expect this court to find that the tears and vents were caused by the steamship or Stevedores. The record is barren of any evidence to justify any such conclusion. Cuts, tears on the wrappers, and vents going through to the pulp were present in a great many of the bales on January 26 when they were first inspected and from January 13 and 14 to January 26 the bales were at all times in the custody of Terminal. No evidence of the kind or degree of care for the shipment of bales that was exercised by Terminal was introduced in this case even though it was peculiarly within the knowledge of Terminal as to how much and the nature of the care it did exercise to see that the bailed goods were not damaged. The conclusion is compelled that either employees of Terminal caused the vents in the bales or Terminal permitted their existence while in their custody by a failure to exercise reasonable care for their protection. It is difficult to believe that any other conclusion could be arrived at. There is nothing of conjecture or surmise in such a conclusion. The plaintiffs did not have to prove the exact manner in which the damage was caused, whether because of vents made by "chisel trucks" in moving the bales about the pier, or otherwise. The fact that the vents which allowed the extraneous material to sift into the bales were caused while the bales were in the custody of Terminal, it is reasonable to infer they were due to Terminal's negligence in caring for the bales. That is enough.

There was no evidence upon which a finding could be based that the Railroad caused any damage whatsoever in carrying the 1,950 bales to Billerica and, consequently, it is reasonable to infer, inasmuch as those bales were in the same condition as the 300 bales that were on the pier and no other agency handled them, that the damage to them was caused while they were in the custody of Terminal and before their shipment to the warehouse.

▌ It is my conclusion that the damage to the wood pulp was caused by negligence of The Mystic Terminal Company and that judgment against it should be entered for the plaintiffs in the sum of $6,000, with costs. Judgment may also be entered for the Boston and Maine Railroad, without costs.